### WALTER PANNELL v. THE STATE.

#### No. 3989.    Decided November 11, 1908.

**1.—Murder—Charge of Court—Manslaughter—Self-Defense.**

Where upon trial for murder the defendant was convicted of manslaughter, and the evidence showed that all the facts and attendant circumstances, viewed from the defendant's standpoint, that the deceased was rather in the

wrong, and the court so marshalled the facts in his charges on manslaughter and self-defense that the jury could predicate their finding of manslaughter or self-defense on the same state of facts. Held that the court's charge on manslaughter was of such erroneous character that it may have brought about the conviction of manslaughter on facts that authorized an acquittal.

### 2.—Same—Charge of Court—Threats.

Where threats of the deceased are in evidence in case of murder the criterion is that if the defendant believed the threats were made by deceased he may act upon them, it makes no difference whether they were in fact made; but upon trial for murder where the evidence showed that threats of the deceased were in fact made, although not legally correct, it could not harm the rights of the defendant that the court's charge left the jury to find if the threats were in fact made.

### 3.—Same—Evidence—Charge of Court—Weight of Evidence—Self-Defense.

Upon trial for murder where the State introduced evidence that defendant swore on a former trial that he had had carnal intercourse with the wife of the deceased before the killing, but it was not shown for what purpose this testimony was introduced, the same may have been admissible; yet it was reversible error to limit this testimony by the court's charge to the purpose of showing motive on part of the defendant, as defendant had not forfeited by his said acts his right of self-defense; besides the charge singled out this one fact and was on the weight of the evidence. Following Terry v. State, 45 Texas Crim. Rep., 264.

Appeal from the District Court of Hopkins. Tried below before the Hon. R. L. Porter.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*C. O. Jones* and *C. E. Sheppard,* for appellant.—On question of the charge on law of threats: Tillery v. State, 5 S. W. Rep., 842.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of manslaughter, his punishment being assessed at two years confinement in the penitentiary.

The substance of the evidence is that there was unkind feelings between appellant and deceased, deceased being jealous in regard to the relations that he believed existed between appellant and his wife, and which may, in fact, have existed. Deceased had conceived the idea, with perhaps evidence to justify his belief, that appellant had alienated to some extent the affections of his wife, and was suspicious if not convinced of the fact that they had been criminally intimate. This engendered in his mind an excited state of ill-will towards appellant, so much so that on one or more occasions he had threatened to take the life of appellant. Some time previous to the homicide deceased armed himself and asked a friend to accompany him to the oil mills where he thought he would catch appellant and his, deceased's, wife in compromising relations. The friend did

not accede to the request, but deceased went to the point and there found appellant. A witness testified that he heard part of the conversation between appellant and deceased at the oil mills in which deceased proposed to appellant to shoot it out or cut it out with him. Appellant declined. The wife of deceased, however, was not present with appellant, nor is there any evidence tending to show that she had been with appellant at that time and place. On the night of the homicide the negroes of the town had met at the residence of Jeff Sparks to engage in a "festival." Sparks expected to sell candies and other things to the assembled crowd, and was in a room in the house making preparations to this end. The crowd had congregated in one of the rooms of the house where they were playing and dancing. While engaged in dancing, deceased was dancing with his wife, appellant was dancing with the sister-in-law of deceased, Lela Templeton. Deceased was "calling the set," had called all around until he reached appellant and Lela Templeton. At this point he failed to call and appellant asked if he did not intend to call his dance. Deceased inquired whether he liked it. Appellant indicated he did not. Lela Templeton testified at this point that she did not recollect just what was said between the parties, "but I think I said, 'Harrison, mind out your business,' and he said I thought you negroes had sense to know when your time come. I don't know exactly what Gete said, but he said something like if you are going to call this set why don't you call us like the rest? Then Harrison said something, asked if he did not like it or something like that and Gete said no, you God damn black bastard, I don't, then they both threw their hands to their pockets like they were going after their guns and started towards each other. I caught hold of Gete and Ellen took hold of Harrison. Gete turned around to Jim Nash, a boy they always called Monk, and said, 'Monk, let's go home, I will get into trouble here.' Monk said, 'Let's be hitting the door' and they started on out of the house. Harrison was trying to get loose and I took hold of him and helped Ellen to hold him. He said, 'turn me loose, I am not scared of the damn son-of-a-bitch.' When Harrison said this Gete turned and said, 'If you follow me out of here with that little Harrington I'll make you eat it up.'" Gete is the nickname for appellant. Ellen is the wife of deceased and witness was the dancing partner of appellant. This is practically the State's case of the transaction to that point. Lum Kay testified for the appellant that he knew the parties and was present at the time of the killing and saw both difficulties. "The first one came up over the dance. Harrison was calling the set and Gete was dancing in it. Harrison called all the boys till it came Gete's time and then he did not call him. Gete asked him why he didn't call him and Harrison said, 'You damn negroes ought to know when your time comes,' and then he asked Gete if he

didn't like it and said, 'If you don't like it rise up.' He then threw his hand to his right hip pocket and started towards Gete. Gete threw his hand towards his pocket and Harrison's wife and Lela Templeton grabbed Harrison. Gete walked off and said to Jim Nash, 'Come on and let's go, I will get into trouble here.' He then started on out and Harrison was trying to get loose and said, 'Turn me loose, he's got his gun and I've got mine.' Gete said, 'Don't follow me out here with that little Saturday night gun or I'll make you eat it.' Gete then went on out. Directly Gete came back in the room where the dance was and was talking to Ada Bates by the fire. Harrison came in and looked straight at Gete. Joe Bates called him and said something to him about not having any trouble and Harrison spoke out loud enough for Gete to hear him that he was not afraid of the damn long black son-of-a-bitch and then walked over in the corner close to Gete. Louis Templeton walked up to him and said something to him and he again said he was not afraid of the son-of-a-bitch, and then said to Gete: 'Gete, do you think I am scared of you?' and Gete said, 'No, you are a man just like me.' Harrison was then walking over to the corner and while he was doing so he had his right hand back to his hip pocket. About the time he said this Louis Templeton moved out of the way and the defendant shot. Harrison fell and his pistol fell down on the floor right by him." Some · of the evidence goes to show that as the deceased approached appellant while he was standing in the corner, and while Louis Templeton was standing between them, appellant said, "get out of the way," or "clear the way." Templeton stepped out of the way, the shot was fired and deceased fell. There is but little difference, if any, in regard to what was said and done in regard to the second difficulty. All the evidence shows that the deceased's pistol fell when he fell and was lying on the floor by him. Between the first and second difficulties when appellant went out of the house with the expressed intention of leaving, he met the owner of the premises, Sparks, in the yard and Sparks requested him to go on back the trouble was over and there would be no more trouble. Upon this statement appellant returned to the dancing room. Deceased came in the house directly after appellant returned, and the difficulty was renewed which ended in the tragedy. Without going into a further detailed statement of this matter, this sufficiently presents the case for a discussion of the questions involved.

The jury in convicting of manslaughter assessed the lowest punishment. Therefore all errors in regard to the charge passed out of the case unless the charge on manslaughter, as given, may have induced the jury to convict appellant of manslaughter, and to refuse to acquit on the ground of self-defense. As a general rule whatever errors there are in the charge are eliminated by reason of acquittal of the offense to which the charge pertains. It may be also stated,

as a general rule, that all errors in the charge pertaining to the offense of which appellant is convicted, also pass out if the minimum punishment is assessed, if the facts conclusively show him guilty of that particular offense. But there is another rule, equally well recognized if the error in the charge pertaining to the offense of which the jury convicted, injured appellant's rights in respect to a lower offense, or to the question of self-defense, and had a tendency to bring about a conviction for the offense of which he was convicted, instead of a lower offense, or an acquittal, then the charge would be reversibly erroneous. The charge in respect to manslaughter and which seemed to be the basis of the conviction, was almost identical with that in respect to self-defense. After giving the usual stereotyped definition of adequate cause and sudden passion, the court charged the jury as follows: "If you should believe from the evidence that the defendant, Walter Pannell, killed the deceased, Harrison Carr, by shooting him with a pistol at the time, place and in the manner alleged in the indictment yet, if you should further believe that by the acts or conduct, or words, if any, or both of deceased, at the time of and immediately before the killing, as they appeared to the defendant from his standpoint, in connection with all previous facts, and circumstances of whatever nature or character, and in connection with all the surrounding facts and circumstances as known to or believed by defendant and viewed from his standpoint, created in the mind of the defendant such a degree of anger, rage, sudden resentment or terror as to render his mind incapable of cool reflection at the time of the killing and because thereof the defendant shot and killed said Harrison Carr, and not in self-defense, then the defendant would not be guilty of any higher degree of homicide than manslaughter." The charge on self-defense is as follows: "If you believe from the evidence that the defendant Walter Pannell, shot and killed Harrison Carr on or about the 21st day of February, 1907, in Hopkins County, Texas, and if you further believe that at the time of the killing or shortly prior thereto, the deceased was in the act of making an attack upon the defendant, or made some demonstration indicating an intention of inflicting death or serious bodily injury upon the defendant, or if deceased was doing some act or acts, which either alone or together with accompanying words, if any, produced in the mind of the defendant as viewed from his standpoint which considered with all the facts and circumstances as known to the defendant or as believed by the defendant to exist, a reasonable apprehension of death or serious bodily injury at the hands of said Harrison Carr then the defendant had the right to kill the deceased in self-defense, and if you believe that he did kill deceased to protect himself from said danger or apparent danger, then such killing is in justifiable self-defense." These charges, as we understand ·

them, are practically the same and put appellant in the attitude of standing before the jury upon the same facts in regard to manslaughter and self-defense. We have before stated the salient features of the evidence as given by the witnesses. While it is sometimes a little difficult to draw the exact line between manslaughter and self-defense on the immediate facts, yet, it is not permissible for the court to authorize a conviction for manslaughter upon the facts which justify a killing. All the facts and attending circumstances, viewed from the defendant's standpoint, and as exhibited by this record, show that a few moments before the tragedy, there had been a threatened serious trouble between the parties, with the deceased rather in the wrong. He had threatened the life of appellant and on a prior occasion at the oil mills, proposed to fight it out with him to the death, either by shooting or by cutting. Upon the second difficulty, or meeting in the dancing room, the deceased approached appellant over the protest of his friends not to have trouble, using language indicating that he intended to have a difficulty in which he called appellant a "son-of-a-bitch," repeating the same language when again cautioned not to have a difficulty. In the meantime as he approached the defendant in the corner, he had his hands upon his pistol pocket and was in that condition when he used the second insulting remark. The shooting came off, deceased's pistol was heard to strike the floor and was found by his side. These were the facts upon which the jury were to predicate the finding of manslaughter, or self-defense, both as set forth in the charges. These charges were so framed that the jury was left to understand that upon the facts marshalled by the charge, appellant could be convicted of manslaughter, or acquitted on self-defense at the option of the jury. We are of opinion this charge on manslaughter was of such erroneous character that it may have brought about a conviction of manslaughter on facts that authorized an acquittal. The court's charge in regard to threats was also criticised in that it instructed the jury if they believed deceased made threats, and at the time of the difficulty, made demonstrations as if to execute the threats, to consider with reference to the question of self-defense. The vice in the charge as urged, is that it left the jury to find the threats were in fact made; whereas, they should have been told that the criterion was that if the appellant believed the threats were made. It makes no difference whether the threats were in fact made or not, if he was so informed and believed. The jury might, under the later developments of the case, have found that they were in fact made, or believed they were not in fact made. It does not seem to be controverted, however, in this case that the threats were made and that appellant knew of the animosity and ill-will, especially by reason of the fact of deceased's offer to fight him to the death at the meeting at the oil mills. Other threats

were shown to have been made, but the record does not disclose them to have been communicated to appellant. The proposition of appellant is a correct theory of the law in a proper case. We call attention to this so that upon another trial the court will submit this question from the appellant's standpoint. D. L. Palmer was called by the State in rebuttal and testified as follows: "I was a member of the jury that tried the defendant in this case the last term of court. He testified in his own behalf at that trial. I remember that he swore then that he had had carnal intercourse with Harrison Carr's wife before the killing. I don't remember how many times he said he had intercourse with her and don't remember whether he said it was while she and Harrison were separated or not."

Objection was urged to the introduction of this testimony. It is not clear to our mind that this testimony was objectionable. Just why the State offered it, we are in doubt. It is evident, we think, from the record that deceased was not only jealous on account of his wife, but his feelings were very bitter, and that in fact this feeling of jealousy and anger led to the final tragedy. Deceased had expressed himself to the effect that he thought there was something wrong between them and expressed a desire or purpose to kill both of them, and in one conversation expressed himself as anxious to meet appellant and kill him and go to hell with him. There had been no direct evidence, however, introduced to the fact of intercourse between the parties. The reason for the admission of this testimony may be found, however, in the court's charge to which an exception was reserved, and if that was the purpose for which it was introduced, then we are of opinion there was error. In any event, we are clearly of the opinion that the court's charge limiting this evidence was error and of serious import. The court gave the law as he understood it, as applicable to this evidence in the following charge: "You are further instructed that the evidence introduced in this case showing that defendant had been guilty of having carnal intercourse with the wife of the deceased prior to the time of the homicide can be considered by you only for the purpose of showing motive, if any, on the part of the defendant, and you will consider such evidence for no other purpose."

We are of opinion that this charge is erroneous. It assumes the fact that the intercourse occurred and instructs the jury that they can consider the fact of such intercourse only as showing the motive of appellant in the killing of deceased. The evidence shows that appellant had tried to evade difficulties with the deceased, and it may have been on account of the fact that he had wronged deceased, but from whatever motive it occurred, he had declined to fight him and sought to evade rather than bring on the difficulty. The deceased had pressed the matter which ended in his death. Appellant did not forfeit

his right of self-defense under the circumstances of this case, if it be conceded he had been having intercourse with deceased's wife. While this was an adequate cause resulting in favor of the deceased if accompanied by sudden passion to reduce his killing of appellant, had it occurred, to manslaughter, still we have appellant and not deceased on trial and the case must be viewed from appellant's standpoint. This would not require him to stand and be shot to death, his right of self-defense under the circumstances would be perfect. It may have left on the mind of appellant, and doubtless did, an impression that the deceased intended to press the difficulty to his, appellant's, death and there was no other course left to him but to shoot, and the fact may have operated upon his mind most cogently that his life was at the time being sought by the deceased. It was a cogent reason in appellant's favor, under the law of self-defense, rather than against him to show a criminal motive in the killing, under the facts. Again, this charge singles out one fact and charges adversely to appellant upon it. This is a charge upon the weight of the evidence, and in a very hurtful manner to appellant's cause before the jury. It had the tendency to eliminate his right of self-defense, and it selected this one single circumstance as the criterion of his motive for the homicide. Under the decisions as written in this State, this is not only a charge upon the weight of the evidence but the singling out of a fact and giving it undue prominence and in such manner as to operate adversely to appellant's rights on the crucial point. See Terry v. State, 45 Texas Crim. Rep., 264, and cases cited. For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*